IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Alice Marie Russell, | ) | C/A No.: 1:13-2283-BHH-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I.    Relevant Background

A.    Procedural History

On August 9, 2010, Plaintiff filed an application for DIB in which she alleged her disability began on June 1, 2008.  Tr. at 68, 92.  Her application was denied initially and upon reconsideration.  Tr. at 76–80, 82–83.  On February 7, 2012, Plaintiff had a hearing before Administrative Law Judge ("ALJ") John S. Lamb.  Tr. at 28–65 (Hr'g Tr.).  The ALJ issued an unfavorable decision on April 13, 2012, finding that Plaintiff was not disabled within the meaning of the Act.  Tr. at 9–20.  Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  Tr. at 1–3.  Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on April 25, 2013.  [Entry #1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 47 years old on her date last insured ("DLI").  Tr. at 212.  She completed high school and some college.  *Id.*  Her past relevant work ("PRW") was as an administrative clerk.  Tr. at 57–58.  She alleges she has been unable to work since June 1, 2008.  Tr. at 212.

2.    Medical History

Plaintiff presented to Fitzwilliam W. King, M.D., on September 6, 2007, to discuss COPD.  Tr. at 219.  Dr. King noted that pulmonary function testing was normal and that he suspected deconditioning to be the source of Plaintiff's shortness of breath.

*Id.*  Dr. King noted that Plaintiff's migraines were "reasonably well controlled until she stops sleeping."  *Id.*

On July 8, 2008, Plaintiff presented to Dr. King regarding high cholesterol and high lipids.  Tr. at 224.  Dr. King noted depression, but no other complaints.  *Id.*

Plaintiff saw Dr. King on July 11, 2008, regarding smoking cessation, high blood pressure, and depression.  Tr. at 225.

Plaintiff presented to Dr. King on October 3, 2008, with complaint of migraine. Tr. at 223.  Dr. King administered an intravenous injection of Demerol and Phenergan. *Id.*

On November 12, 2008, Plaintiff presented to John R. Rowell, M.D., after being referred by Dr. King for knee pain of approximately one month's duration.  Tr. at 247. Dr. Rowell noted that Plaintiff had other joint complaints that were not addressed during the visit and that Plaintiff indicated that she was told that she may have fibromyalgia.  *Id.* Dr. Rowell observed that Plaintiff had good neck motion without pain; that she walked well with no obvious pain or limp; that she had mild patellofemoral crepitation; that her knee was stable in full extension and slight flexion; that McMurray's testing was negative; and that she had painless hip, ankle, and foot motion.  *Id.*  X-rays of Plaintiff's bilateral knees indicated good joint space medially and laterally with small spurs at the medial intercondylar notch and laterally in the right knee and a minimal spur at the medial aspect of the intercondylar notch in the left knee.  *Id.*  Plaintiff was advised to engage in quad exercises.  *Id.*

On December 5, 2008, Plaintiff complained to Dr. King of right knee pain for two months, which worsened with activity. Tr. at 221. Dr. King indicated that Plaintiff's gait/station was normal. *Id.* Dr. King referred Plaintiff for orthopedic and rheumatology consultations. *Id.*

On January 20, 2009, Plaintiff complained to Dr. King of pain and swelling in and about her shoulders and in the apical area of the longus of her neck. Tr. at 306. Dr. King noted tenderness about Plaintiff's chest wall and swelling in the apical areas. *Id.* Dr. King referred Plaintiff for x-ray and sed rate and indicated that he would refer Plaintiff to rheumatology if the x-ray and sed rate were not revealing. *Id.*

Plaintiff returned to Dr. Rowell on January 23, 2009. Tr. at 249. She reported improvement in right knee pain, but discomfort with squatting and stair climbing. *Id.* She was advised to resume use of DayPro, to engage in long-term quad exercises, and to avoid stair climbing and squatting. *Id.*

Plaintiff presented to Ana Funariu, M.D., for initial rheumatology consultation on January 28, 2009. Tr. at 292–94. Dr. Funariu noted "2003 onset of neck pain, sometimes radiating to the shoulder blades, lasting 1–2 weeks, now occurring almost once a month." Tr. at 292. Plaintiff reported swelling in her lateral neck with minimal pain below the waist line, except the knees. *Id.* Dr. Funariu noted fullness over Plaintiff's supraclavicular area, but normal muscle strength. Tr. at 292–93. Dr. Funariu also noted normal wrists, hands, and upper arms; tenderness on Plaintiff's subdeltoid bursa; no tenderness on Plaintiff's hip bursa; normal range of motion of Plaintiff's hips; normal ankles and feet; paraspinal muscle spasm in Plaintiff's neck; normal range of motion of

4

Plaintiff's neck; bilateral trapezius tenderness; and positive fibromyalgia tender points on Plaintiff's epicondyles, chest, back, and neck.  Tr. at 293.  Dr. Funariu noted "possible fibromyalgia component."  Tr. at 294.  X-ray of Plaintiff's cervical spine indicated disc degenerative changes in her mid-cervical spine.  Tr. at 296.

Plaintiff engaged in weekly physical therapy at Accelerated Physical Therapy between January 29, 2009, and February 20, 2009.  Tr. at 250.  She underwent a detailed evaluation on February 5, 2009.  Tr. at 253–54.  Plaintiff indicated that she had been experiencing shoulder and upper back pain for five years, but that she could not recall any specific injury.  Tr. at 253.  She indicated that she was responsible for weekday care from 5:30 a.m. to 7:00 p.m. of four grandchildren, who ranged in age from two to ten.  *Id.* The physical therapist, K. Rena Stevens, observed that Plaintiff was tender to palpation along both upper trapezius musculatures; that her cervical active range of motion was within normal limits for forward flexion and extension; that side bending of Plaintiff's neck was limited to 28 degrees to the right and 30 degrees to the left; that right rotation was 90 percent and left rotation was 75 percent; that shoulder flexion was 145 degrees on the right and 140 degrees on the left; that shoulder abduction was 150 degrees on the right and 135 degrees on the left; that Plaintiff's internal and external shoulder rotation were within normal limits; and that Plaintiff had positive sulcus sign of the left shoulder. *Id.*  Plaintiff was advised to become independent with a home exercise program and to discontinue carrying her two-year-old grandchild in her left arm.  Tr. at 254.

Plaintiff followed up with Dr. Funariu on March 6, 2009, with complaints of joint pain, cervicalgia, and morning stiffness lasting greater than 30 minutes.  Tr. at 289.  Dr.

5

Funariu's examination revealed the following: normal wrists, hands, shoulders, and upper arms; no hip tenderness; normal flexion, extension, and hip rotation; normal ankles and feet; paraspinal muscle spasm in neck; normal range of motion of neck; positive trapezius tenderness; and positive fibromyalgia tender points on the epicondyles, chest, back, and neck.  Tr. at 289–90.

On June 2, 2009, Plaintiff followed up with Dr. Funariu.  Tr. at 286–88.  Dr. Funariu observed the following on examination:  normal wrists, hands, shoulders, and upper arms; positive tenderness on hip bursa; normal flexion, extension, and rotation of the hips; normal ankles and feet; paraspinal muscle spasm of neck; normal range of motion of neck; bilateral trapezius tenderness; and positive fibromyalgia tender points on the epicondyles, chest, back, and neck.  Tr. at 286–87.

Plaintiff presented to Dr. King on August 7, 2009, complaining of a migraine that started that morning.  Tr. at 305.  She indicated that she was prescribed Demerol and Phenergan the last time she had a migraine.  *Id.*  Dr. King again injected Plaintiff with Demerol and Phenergan and instructed her to rest.  *Id.*

On August 20, 2009, Plaintiff visited Dr. King with complaint of problems with Tramadol.  Tr. at 304.  She was advised to discontinue Tramadol and she was prescribed Citalopram.  *Id.*

Plaintiff followed up with Dr. King on November 19, 2009, and reported having a headache for two days and increased blood pressure.  Tr. at 303.  Dr. King noted that Plaintiff's fibromyalgia was quite debilitating and depressing.  *Id.*

Plaintiff visited Dr. Funariu for a six-month follow up on November 30, 2009. Tr. at 283–85. Plaintiff reported right knee pain and indicated that taking more than three Ultram per day made her drowsy. Tr. at 283. Dr. Funariu's examination revealed normal wrists, hands, shoulders, and upper arms; positive tenderness on Plaintiff's hip bursa; normal flexion, extension, and rotation of Plaintiff's hips; no vertebral spine tenderness; paraspinal muscle spasm; normal range of motion of Plaintiff's neck; trapezius tenderness; positive fibromyalgia tender points on Plaintiff's epicondyles, chest, back, and neck; normal flexion of Plaintiff's knee; positive bilateral crepitation of Plaintiff's knee joints; and tender joint line on Plaintiff's right knee. Tr. at 283–84. Plaintiff received a Celestone injection to her right knee. Tr. at 284–85.

Plaintiff followed up with Dr. Funariu on March 31, 2010. Tr. at 280–82. Plaintiff reported worsened pain in her low back and hips when walking. Tr. at 280. Dr. Funariu noted normal range of motion and no tenderness or swelling in Plaintiff's wrists, hands, shoulders, and upper arms. *Id.* She noted positive tenderness on Plaintiff's hip bursa; paraspinal muscle spasm in Plaintiff's neck; normal range of motion of Plaintiff's neck; positive trapezius tenderness; positive fibromyalgia tender points on Plaintiff's epicondyles, chest, back, and neck; positive bilateral crepitation in Plaintiff's knees and right joint line tenderness; vertebral spine tenderness; and negative straight leg raise. Tr. at 280–81.

On April 12, 2010, Plaintiff underwent MRI of her lumbar spine, which revealed moderate to severe facet arthropathy bilaterally at L4-5 with spurring and bulging of

ligamentum flavum and a small left L5-S1 foraminal protrusion abutting the left L5 nerve root at the neural foramen.  Tr. at 297.

On April 27, 2010, Plaintiff received bilateral L4-5 and L5-S1 lumbar facet injections.  Tr. at 299.

On June 30, 2010, Plaintiff followed up with Dr. Funariu.  Tr. at 277–79.  She reported doing well with less joint pain, taking medication without side effects, having less morning stiffness, and having no joint swelling.  Tr. at 277.  Dr. Funariu noted no swelling, normal range of motion and normal grip in Plaintiff's bilateral hands.  *Id.*  Dr. Funariu noted no tenderness or swelling and normal range of motion of Plaintiff's shoulders.  *Id.*  Dr. Funario noted tenderness in Plaintiff's bursa, but normal range of motion.  *Id.*  Dr. Funariu indicated limited lateral bending, limited flexion and extension in Plaintiff's neck, and positive trapezius tenderness.  Tr. at 277–78.  She noted positive fibromyalgia tender points on Plaintiff's epicondyles, chest, back, and neck.  Tr. at 278.  She indicated positive bilateral crepitation in Plaintiff's knees, but no vertebral spine tenderness.  *Id.*  Straight leg raise was negative.  *Id.*

On July 2, 2010, Plaintiff visited Dr. King to follow up on neck pain and to obtain medication refills.  Tr. at 302.  He recommended that Plaintiff have x-rays.  *Id.*

Plaintiff followed up with Dr. King on August 13, 2010, for medication refills.  Tr. at 301.  Dr. King noted that Plaintiff's fibromyalgia was not well controlled.  *Id.*

On December 28, 2010, Plaintiff presented to Dr. Funariu for a six-month follow up.  Tr. at 313–15.  She reported joint pain and pain in her right knee that prevented her from walking and exercising.  Tr. at 313.  Dr. Funariu observed Plaintiff to have normal

wrists, hands, shoulders and upper arms; positive tenderness on the bursa of her hips; normal range of motion of her hips; bilateral paraspinal muscle spasm of her neck; limited lateral bending, flexion, extension, and rotation of her neck; trapezius tenderness; positive fibromyalgia tender points on her epicondyles, chest, back, and neck; normal knee flexion; joint line tenderness of the right knee; bilateral crepitation of the knee joints; no vertebral spine tenderness; and negative straight leg raise.  Tr. at 313–14.  Dr. Funariu injected Plaintiff's right knee with Celestone.  Tr. at 315.

        C.      The Administrative Proceedings

              1.      The Administrative Hearing

                    a.      Plaintiff's Testimony

At the hearing on February 7, 2012, Plaintiff testified that pain in her neck and low back were her worst impairments.  Tr. at 34.  Plaintiff also indicated that she had pain in her bilateral shoulders.  Tr. at 36.  Plaintiff testified that she had been diagnosed with fibromyalgia.  Tr. at 38.  Plaintiff complained of bilateral knee pain and indicated that the left knee was worse than the right.  Tr. at 39.  Plaintiff indicated that she took antidepressant medications.  Tr. at 40.

Plaintiff testified that she could walk 100 feet without pain.  Tr. at 43.  She indicated that she did no lifting.  *Id.*  She testified that she could not sit for long periods of time.  *Id.*  Plaintiff indicated that she was able to drive.  *Id.*

Plaintiff testified that she had difficulty turning her neck.  Tr. at 46.  Plaintiff indicated that she had difficulty holding her arms up and out.  Tr. at 48.

Plaintiff testified that she had migraines in 2008 and that she required three or four injections per year.  Tr. at 49.

Plaintiff testified that she cared for her four grandchildren in her home while their parents were at work.  Tr. at 53.

### b.     Vocational Expert Testimony

Vocational Expert ("VE") Leanna Hollenbeck reviewed the record and testified at the hearing.  Tr. at 56–64.  The VE categorized Plaintiff's PRW as a secretary as semiskilled and light with a SVP of 4 and Dictionary of Occupation Titles ("DOT") number of 219.362-010.  Tr. at 57–58.  The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work activity, but who could never use a ladder, rope, or scaffold; could only occasionally use a ramp or stairs; could only occasionally bend, stoop, crouch, crawl, or balance; and who must avoid concentrated exposure to hazards.  Tr. at 58.  The VE testified that the hypothetical individual could return to Plaintiff's PRW.  *Id.*  The VE also identified other jobs that Plaintiff could perform, which included cashier II, which was light with a SVP of 2 and a DOT number of 211.462-010 with 18,000 positions in South Carolina and over 1,000,000 jobs in the national economy; mail clerk, which was light with a SVP of 2 and a DOT number of 209.687-026, with 700 positions in South Carolina and 52,000 in the national economy; and parking lot attendant, which was light with a SVP of 2 and a DOT number of 915.473-010, with 900 positions in South Carolina and 136,000 jobs in the national economy.  Tr. at 59.  The ALJ asked a second hypothetical in which he changed the light exertional level to the sedentary exertional level, but kept the other limitations set forth in

the first hypothetical question.  *Id.*  The VE indicated that Plaintiff had transferable skills from past work that included verbal recording and record keeping, information gathering, and data entry.  Tr. at 59–60.  The VE identified jobs involving transferable skills from Plaintiff's PRW that included receptionist, which was sedentary with a SVP of 4 with 3,800 positions in South Carolina and 465,000 jobs in the national economy; data entry clerk, which was sedentary with a SVP of 3 with 2,300 jobs in the local economy and 250,000 jobs in the national economy.  Tr. at 61.  The VE also identified the sedentary and unskilled jobs of surveillance system monitor with 700 positions in South Carolina and 60,000 nationally; order clerk, food and beverage with 600 positions in South Carolina and 70,000 nationally; and ink presser with 350 jobs in South Carolina and 30,000 nationally.  *Id.*  The ALJ then asked the VE to assume that the hypothetical individual could not on a regular and sustained basis engage in work activity eight hours a day, five days a week, for a 40-hour workweek.  Tr. at 61–62.  The VE indicated that the individual would be unable to engage in work.  Tr. at 62.

Plaintiff's attorney asked the VE to assume the restrictions in the sedentary hypothetical, but to further assume that the individual would be unable to reach in front or overhead on a repetitive basis and would be absent from work for two to three consecutive days per month.  *Id.*  Plaintiff's attorney asked if the hypothetical individual could perform any of the jobs that were previously identified.  *Id.*  The VE indicated that the individual would be unable to work with such frequent absences.  *Id.*  However, she testified that some jobs could be performed with the reaching restriction alone, including surveillance systems monitor.  *Id.*  Plaintiff's attorney then asked the VE if the individual

11

could perform the jobs identified in response to the light hypothetical with the additional restrictions of being unable to reach in front or overhead on a repetitive basis and being absent from work for two to three consecutive days per month. Tr. at 63. The VE indicated that she thought the individual would lose any job and that the problems with reaching would reduce the number of jobs. *Id.* Plaintiff's attorney then asked if Plaintiff's PRW could be performed if the individual were limited to turning her neck occasionally and reaching occasionally. Tr. at 63–64. The VE indicated that Plaintiff's PRW could not be performed because Plaintiff's PRW required frequent reaching. Tr. at 64.

> 2.      The ALJ's Findings

In his decision dated April 13, 2012, the ALJ made the following findings of fact and conclusions of law:

1.   The claimant last met the insured status requirements of the Social Security Act on September 30, 2008.
2.   The claimant did not engage in substantial gainful activity during the period from her alleged onset date of June 1, 2008 through her date last insured of September 30, 2008 (20 C.F.R. § 404.1571 *et seq.*).
3.   Through the date last insured, the claimant had the following severe impairments: arthritis in upper neck and low back, fibromyalgia, and shoulder impairment (20 C.F.R. § 404.1520(c)).
4.   Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 404.1520(d), 404.1525, and 404.1526).
5.   After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except she is unable to climb ladders, ropes, or scaffolds, should no more than occasionally climb ramps or stairs, bend, stoop, crouch, crawl, or balance, and should avoid concentrated exposure to hazards.

6.     Through the date last insured, the claimant was unable to perform any past relevant work (20 C.F.R. § 404.1565).

7.     The claimant was born on May 17, 1961 and was 47 years old, which is defined as a younger individual age 45–49, on the date last insured (20 C.F.R. § 404.1563).

8.     The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

9.     The claimant has acquired work skills from past relevant work (20 C.F.R. § 404.1568).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, the claimant had acquired work skills from past relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy (20 C.F.R. § 404.1569, 404.1569(a), and 404.1568(d)).

11.     The claimant was not under a disability, as defined in the Social Security Act, at any time from June 1, 2008, through September 30, 2008, the date last insured (20 C.F.R. § 404.1520(g)).

Tr. at 14–19.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    The ALJ failed to properly weigh the opinion of Plaintiff's treating physician;

2)    The ALJ's RFC finding is not based on substantial evidence;

3)    The ALJ failed to call on a medical expert to determine the onset date of Plaintiff's disabling impairments; and

4)    The ALJ failed to evaluate the lay opinion of Plaintiff's husband.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity.  20 C.F.R. § 404.1525.  If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment.  20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria."  20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen*

impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls*

---

*v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

*v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002).  If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work.  *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party."  42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case.  *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence."  *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence.  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).  Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational.  *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is

16

substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

### B. Analysis

#### 1. Treating Physician's Opinion

If a treating source's medical opinion is "well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight[.]" SSR 96-2p; *see also* 20 C.F.R. § 404.1527(c)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence). The Commissioner typically accords greater weight to the opinion of a claimant's treating medical sources because such sources are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. § 404.1527(c)(2).

However, "the rule does not require that the testimony be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam). The ALJ has the discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d, 171, 176 (4th Cir. 2001). Furthermore, "Opinions on some issues . . . are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings

that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. § 404.1527(d). "Opinions that you are disabled" are among those reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(1). The law does not give "any special significance to the source of an opinion on issues reserved to the Commissioner." 20 C.F.R. § 404.1527(d)(3). "[A] treating physician's opinion is only entitled to such…deference when it is a medical opinion." *Curler v. Comm'r of Soc. Sec.*, ---- Fed. Appx. ----, 2014 WL 1282521, at *6 (6th Cir. April 1, 2014) *citing Turner v. Comm'r of Soc. Sec.*, 381 Fed. Appx. 488, 492–93. "If the treating physician instead submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors— his decision need only 'explain the consideration given to the treating source's opinion.'" *Id. citing Johnson v. Comm'r of Soc. Sec.*, 535 Fed. Appx. 498, 505 (6th Cir. 2013) (quoting SSR 96-5p).

"The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination of disability, including opinions from medical sources about issues reserved to the Commissioner." SSR 96-5p. "If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record. *Id.*

If the treating physician's opinion is not entitled to controlling weight, "[c]ourts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between

the physician and the applicant, (3) the supportability of the physician's opinion, (4) the

consistency of the opinion with the record, and (5) whether the physician is a specialist."

*Johnson*, 434 F.3d at 654; *see* 20 C.F.R. § 404.1527(c).

20 C.F.R. § 404.1527 requires that the adjudicator address opinions of treating

sources as follows:

> [T]he notice of the determination or decision must contain specific reasons
> for the weight given to the treating source's medical opinion, supported by
> the evidence in the case record, and must be sufficiently specific to make
> clear to any subsequent reviewers the weight the adjudicator gave to the
> treating source's medical opinion and the reason for that weight.

SSR 96-2p.

In undertaking review of the ALJ's treatment of a claimant's treating sources, the

court focuses its review on whether the ALJ's opinion is supported by substantial

evidence, because its role is not to "undertake to re-weigh conflicting evidence, make

credibility determinations, or substitute [its] judgment for that of the [Commissioner]."

*Craig*, 76 F.3d at 589.

Plaintiff argues that the ALJ failed to accord adequate weight to the opinion of Dr.

King.  [Entry #19 at 10].  Plaintiff further argues that the ALJ erred in failing to state the

weight given to Dr. King's opinion and in failing to properly explain the reasons for

according that weight.  *Id.*

The Commissioner argues that, while the ALJ did not specify the weight he

accorded to Dr. King's opinion, it was clear from the ALJ's discussion of Dr. King's

opinion that the ALJ rejected it.  [Entry #21 at 8].  The Commissioner further argues that

the ALJ's rejection of Dr. King's opinion was reasonable because Dr. King's opinion was not supported by the record or by the subjective evidence.  [Entry #21 at 8–9].

In a letter dated April 11, 2011, Dr. King indicated "[i]n my medical opinion with a reasonable degree of medical certainty, Alice Russell was medically disabled as of September 30, 2008 and remains medically disabled as a result of the following conditions:  Fibromyalgia with chronic pain[,] Recurrent migraine cephalgia[,] Anxiety and Depression[, and] Chronic Pain Syndrome."  Tr. at 345.  He further indicated that the conditions were ongoing well before September 2008 and were worsening with respect to pain.  *Id.*  Dr. King completed an assessment of Plaintiff's mental ability to perform work-related activities on January 16, 2012.  Tr. at 349–50.  He indicated that Plaintiff's ability to understand, remember, and carry out instructions was not affected by her impairment.  Tr. at 349.  He indicated that Plaintiff could constantly understand, remember, and carry out short, simple instructions; understand, remember, and carry out detailed instructions; and make judgment on simple work-related decisions.  *Id.*  He noted that Plaintiff's ability to respond appropriately to supervision, co-workers, and work pressures in a work setting was not affected by the impairment.  *Id.*  He indicated that Plaintiff could frequently interact appropriately with the public, supervisors, and co-workers and that Plaintiff could occasionally respond appropriately to work pressures in a usual work setting and changes in a routine work setting.  *Id.*  He indicated that Plaintiff would not be able to consistently attend at least 18 days out of 20 days of work.  Tr. at 350.  He indicated that Plaintiff would not need to take unscheduled work breaks, due to interruptions from psychiatrically-based symptoms.  *Id.*  He indicated that Plaintiff was

likely to decompensate under the stress of simple, routine workloads of 40 hours per week. *Id.* Dr. King subsequently completed a medical source statement on January 25, 2012, in which he indicated additional limitations and restrictions. Tr. at 346–48. Dr. King indicated that Plaintiff could occasionally lift up to 20 pounds; that she could sit for two hours in an eight-hour workday; that she could stand/walk for one hour in an eight-hour workday; that she did not need to elevate her legs; that she could never reach; that she could occasionally handle, finger, feel, and push/pull with her bilateral hands; that she could occasionally climb stairs and ramps; that she could never climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl; that she would be absent from work more than three times a month because of impairments or treatment; that her experience of pain or other symptoms would constantly interfere with the attention and concentration needed to perform work tasks; and that her limitations had lasted for 12 consecutive months. *Id.*

The undersigned recommends a finding that Dr. King's April 11, 2011, letter is an opinion on an issue reserved to the Commissioner and is therefore not entitled to controlling weight. Dr. King indicated that "Plaintiff was medically disabled as of September 30, 2008," which was intended to direct the decision of disability. *See* Tr. at 345. Dr. King failed to note specific limitations with regard to Plaintiff's RFC in the April 11, 2011, letter. Therefore, while Dr. King's letter dated April 11, 2011, did have to be considered, the ALJ did not have to consider it with the presumption that it was entitled to controlling weight.

The undersigned also recommends a finding that Dr. King's medical source opinions dated January 16, 2012, and January 25, 2012, were not opinions regarding Plaintiff's functional limitations prior to her DLI. The ALJ specifically addressed the opinions and concluded that "updated treatment records demonstrate ongoing deterioration in the claimant's condition well after the date her insured status expired for Title II purpose, September 30, 2008." Tr. at 17. The undersigned notes that only Dr. King's letter dated April 11, 2011, specifically indicated that he was providing an opinion regarding Plaintiff's functioning prior to her DLI. *See* Tr. at 345. The forms completed by Dr. King on January 16, 2012, and January 25, 2012, did not reference or purport to be assessments of Plaintiff's functioning prior to September 30, 2008. *See* Tr. at 346–48, 349–50. This conclusion is further supported by Dr. King's indication in the letter dated April 11, 2011, that Plaintiff's conditions were "worsening in regards to pain." See Tr. at 345. It logically follows that if Plaintiff's condition were worsening over time, the functional limitations imposed by her condition would be greater in January 2012 than on or before September 30, 2008.

Furthermore, while the doctors and the physical therapist who treated Plaintiff after her DLI observed some abnormalities, they did not observe abnormalities that suggested the level of impairment that Dr. King indicated in January 2012. Plaintiff's orthopedist, Dr. Rowell, recommended that Plaintiff avoid stair climbing and squatting. Tr. at 249. K. Rena Stevens, PT, recommended that Plaintiff discontinue carrying her two-year-old grandchild in her left arm. Tr. at 254. While Dr. King suggested that Plaintiff could only occasionally handle, finger, feel, and push/pull with her bilateral

hands, Plaintiff's rheumatologist, Dr. Funariu, consistently noted normal functioning in Plaintiff's hands, wrists, shoulders, and upper arms after Plaintiff's DLI. *See* Tr. at 277, 280, 283, 286, 289, 292, 313. Finally, Plaintiff's activities during and after the DLI were not consistent with the restrictions set forth by Dr. King in January 2012. In fact, Plaintiff indicated in February 2009, over four months after the DLI, that she was caring for four grandchildren, ages two, four, five, and ten, from 5:30 a.m. to 7:00 p.m. on weekdays. *See* Tr. at 253. While Plaintiff indicated in her testimony that caring for the children did not require the same level of activity as her previous job in a daycare, it is clear from the physical therapy assessment that she was lifting the two-year-old after her DLI and that the hours that she was caring for the children were much more substantial than she alleged in her testimony. *See* Tr. at 52–54, 254.

The undersigned recommends a finding that the ALJ properly evaluated Dr. King's opinion. While Dr. King's April 11, 2011, letter was not entitled to controlling weight, the ALJ was still required to consider it based on the criteria set forth in 20 C.F.R. § 404.1527(c), and he did. The ALJ specifically acknowledged the examining relationship when he indicated that Dr. King was Plaintiff's treating physician. *See* Tr. at 18. The ALJ also discussed the treatment relationship when he indicated that Plaintiff treated with Dr. King "very sporadically" prior to the DLI. *See* Tr. at 17. The ALJ addressed the supportability of Dr. King's opinion when he noted that Dr. King treated Plaintiff for "slight chronic obstructive pulmonary disease, migraine headaches, neck and shoulder pain, and elevated blood pressure" and that "respiratory problems and elevated blood pressure responded appropriately to medication." Tr. at 17. The ALJ noted that

23

Dr. King's progress notes showed no abnormal objective findings.  *Id.*  The ALJ addressed the consistency of Dr. King's opinion with the record as a whole when he noted that objective evidence after Plaintiff's DLI showed only "mild" patellofemoral crepitation, stable knee on full extension, and small and "minimal" spurs in Plaintiff's knees. *Id.*

The undersigned recommends a finding that the ALJ's decision is specific enough to make clear to any subsequent reviewers the weight the ALJ gave to Dr. King's opinion and the reason for that weight.  The undersigned agrees with the Commissioner's argument that the ALJ rejected Dr. King's opinion.  The ALJ provided "[t]he opinion of the claimant's treating physician, Dr. King, has been considered, but there is no objective evidence to support his opinion regarding the claimant's work-related limitations on or prior to September 30, 2008."  Tr. at 18.  While the ALJ did not specifically state that he gave no weight to the opinion, he did specifically state that there was no objective evidence to support the opinion.  The undersigned therefore finds it reasonable to infer that the ALJ gave the opinion no weight because there was no objective evidence to support it.  While the Commissioner later argues that the ALJ incorporated parts of Dr. King's opinion into his RFC and Plaintiff argues in reply that this demonstrates that the ALJ's indication of the weight given to Dr. King's opinion was not specific enough, the undersigned does not find it necessary to address this issue.  The Commissioner's *post hoc* rationalization is not binding on the ALJ.  The test here is whether the reviewing court can determine the weight the ALJ gave to the treating source's opinion and the reason for that weight, and the undersigned recommends a finding that the ALJ was clear

enough in the decision to indicate that he was giving no weight to Dr. King's opinion because it was not supported by objective evidence.

The undersigned recommends a finding that substantial evidence supports the ALJ's decision to give no weight to the opinion of Dr. King. The ALJ's indication that Plaintiff had "very sporadic treatment" with Dr. King prior to the September 30, 2008 DLI is supported by the record, which demonstrates that Plaintiff was seen by Dr. King twice during the relevant period from the alleged onset date through the DLI. This included a visit on July 8, 2008, for high cholesterol, high lipids, and depression and a visit on July 11, 2008, for smoking cessation, hypertension, and depression. Tr. at 224, 225. The record only reflects one other date of treatment in the year before Plaintiff's alleged onset date.[3] Plaintiff was seen on September 6, 2007, when Dr. King noted that pulmonary function testing was normal and that Plaintiff's migraines were well-controlled. *See* Tr. at 219. The ALJ's conclusion that the objective evidence from other providers did not support Dr. King's opinion was corroborated by the fact that diagnostic testing within a year-and-a-half of Plaintiff's DLI indicated no significant abnormalities. *See* Tr. at 247, 296. In light of all of the foregoing, the undersigned recommends a finding that the ALJ's decision to reject Dr. King's opinion was supported by substantial evidence.

---

[3] While the record contains a treatment note dated "1-20-08" on page 220, the same treatment note appears again on page 308, but the "8" in the "08" has been altered to a "9." The treatment note indicates "see dictation," and the dictation at page 307 is dated "1-20-09." Based on a thorough inspection of the records, it is clear that the note at page 220 of the record, which is dated "1-20-08" was actually the treatment note from Plaintiff's "1-20-09" visit with Dr. King. The undersigned notes that 1-20-08 was a Sunday and that 1-20-09 was a Tuesday.

2.    Assessment of RFC

Plaintiff argues that the ALJ failed to make a function-by-function analysis of Plaintiff's RFC and failed to address her abilities to sit, stand, and walk. [Entry #19 at 14]. Plaintiff also argues that the ALJ failed to explain how his RFC assessment was supported by the objective evidence. *Id.* Plaintiff contends that the ALJ erroneously failed to consider evidence after Plaintiff's DLI that was linked to Plaintiff's earlier condition. [Entry #19 at 15].

The Commissioner argues that the ALJ's RFC determination was supported by substantial evidence and that any error on the ALJ's part in not articulating a function-by-function assessment was harmless error. [Entry #21 at 11]. The Commissioner also argues that the ALJ considered evidence after Plaintiff's DLI, but concluded that it did not support a finding that Plaintiff was disabled before the DLI. [Entry #21 at 12].

The ALJ's RFC assessment should be based on all the relevant evidence. 20 C.F.R. § 404.1545(a). The RFC assessment must "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p. The RFC must "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . ." *Id.* The ALJ must discuss the claimant's ability to work in an ordinary work setting on a regular work schedule. *Id.*

According to Social Security Ruling 96-8p, "[a]t step 4 of the sequential evaluation process RFC must not be expressed initially in terms of the exertional

categories of 'sedentary,' 'light,' 'medium,' 'heavy,' and 'very heavy' work because the first consideration at this step is whether the individual can do past relevant work as he or she actually performed it."  However, "[a]t step 5 of the sequential evaluation process, RFC must be expressed in terms of, or related to the exertional categories when the adjudicator determines whether there is other work the individual can do."  Furthermore, "[i]t is necessary to assess the individual's capacity to perform each of these functions in order to decide which exertional level is appropriate and whether the individual is capable of doing the full range of work contemplated by the exertional level."

The ALJ found that Plaintiff had the RFC to perform sedentary work, but that she was further limited by an inability to climb ladders, ropes, or scaffolds; an ability to occasionally climb ramps or stairs, bend, stoop, crouch, crawl, and balance; and a need to avoid concentrated exposure to hazards.  Tr. at 16.

Plaintiff points to this court's decision in *Vo v. Astrue*, 518 F. Supp. 2d 715 (D.S.C. 2007), to argue that the ALJ's failure to conduct a function-by-function analysis warrants remand.  However, in *Vo*, this court discussed contradictory case law from district courts in other circuits and concluded "[a]lthough not all courts would remand for this reason, in light of the fact that remand has already been deemed appropriate, the court instructs the ALJ to explicitly discuss Plaintiff's abilities on a function-by-function basis in accordance with Social Security Ruling 96-8p."  *Id.* at 731.  Therefore, this court did not remand *Vo* based on the ALJ's failure to conduct a function-by-function analysis, but merely instructed that it be done where the case was being remanded for other reasons.  Since the 2007 decision in *Vo*, this court has issued subsequent decisions that

indicate that an ALJ's failure to articulate a function-by-function analysis in the decision may be considered harmless error.  In *Mellon v. Astrue*, 2009 WL 2777653, at *13 (D.S.C. August 31, 2009), this court again examined multiple cases from courts that had addressed the function-by-function analysis under Social Security Ruling 96-8p, and concluded "[e]ach of the cases cited above—whether finally resulting in an affirmance or reversal of the Commissioner's decision under review—essentially held that so long as the narrative opinion is sufficiently detailed and cogent on the ultimate issues for the reviewing court to follow the ALJ's logic and reasoning and supported by substantial evidence in the record, then the lack of specific finding on more subordinate issues (such as the domains of functioning in mental impairment claims) does not require reversal." *See also Teague v. Astrue,* 2011 WL 7446754, at *8–9 (D.S.C. December 5, 2011) (finding that the ALJ thoroughly discussed the evidence and that Social Security Ruling 96-8p did not require a specific function-by-function analysis); *Bennett v. Astrue*, 2011 WL 24700070, at *3 (D.S.C. June 20, 2011) (holding that the ALJ's finding regarding Plaintiff's RFC was consistent with the regulations and included limitations based on Plaintiff's abilities to lift, carry, stand, and walk); *West v. Astrue,* 2011 WL 4527355, at *13 (D.S.C. June 6, 2011) (finding that the ALJ did not err in failing to explicitly indicate to what degree Plaintiff's contact with peers and supervisors would be limited).

The undersigned recommends a finding that the ALJ did not err in failing to articulate a function-by-function analysis where the ALJ provided an analysis of Plaintiff's RFC that was supported by substantial evidence in the case record.  Because of Plaintiff's infrequent medical treatment and the lack of objective evidence prior to

Plaintiff's DLI, it was likely difficult for the ALJ to perform a function-by-function analysis.  Nevertheless, the RFC assessed by the ALJ was supported by the Plaintiff's combination of impairments, the medical evidence of record, and subjective evidence gleaned from the records during and immediately following the relevant period.  The ALJ indicated that the medical evidence supported a history of arthritic pain in Plaintiff's upper neck and low back, fibromyalgia, and shoulder impairment.  Tr. at 17.  The ALJ discussed objective test results that indicated the presence of spurs in Plaintiff's bilateral knees and right shoulder bursitis.  *Id.*  He discussed Plaintiff's complaints of pain in her legs and feet and Dr. Rowell's objective findings in the months after Plaintiff's DLI.  *Id.*

In determining Plaintiff's RFC, the ALJ struck a balance between the conflicting opinion data and assessed a RFC that was supported by objective findings and subjective reports in the record during and immediately following Plaintiff's DLI. The ALJ indicated that he considered the opinions of the state agency consultants and Dr. King, but that he accorded little weight to the state agency physicians' opinions because they did not review additional evidence later made part of the record and that Dr. King's opinion was not supported by objective evidence prior to Plaintiff's DLI.  Tr. at 18.  The ALJ also considered Plaintiff's subjective complaints in assessing her RFC.  He indicated that "[w]hile Ms. Russell may have experienced some pain with prolonged strenuous activity, she was able to move about in a satisfactory manner."  *Id.*  The ALJ's conclusion that Plaintiff was reduced to sedentary work with additional restrictions on her abilities to climb, bend, stoop, crouch, crawl, balance, and be exposed to hazards was supported by his conclusion that Plaintiff's pain was exacerbated by "prolonged strenuous activity"

during the relevant period.  By finding that Plaintiff was limited to sedentary work, which by definition does not require prolonged standing and walking, he allowed for restrictions imposed by Plaintiff's complaints of pain in her legs and feet in the months following her DLI.  Also, by finding that Plaintiff was restricted to occasional climbing, stooping, crouching, and crawling, he set forth specific restrictions that addressed Plaintiff's knee problems that were documented in the months following her DLI.

The undersigned recommends a finding that the ALJ considered evidence created after Plaintiff's DLI in determining Plaintiff's RFC.  The ALJ specifically mentioned evidence created after Plaintiff's DLI and specifically noted that he was according little weight to the opinions of the state agency consultants because they did not consider this information.  *See* Tr. at 17, 18.  Therefore, the undersigned finds Plaintiff's argument concerning deficiencies in the RFC assessment to be without merit.

### 3.    Medical Expert

Plaintiff argues that the ALJ erred in failing to determine if Plaintiff was disabled at any time and in failing to obtain the testimony of a medical expert to determine the onset date of Plaintiff's disability.  [Entry #19 at 15–16].

The Commissioner argues that the ALJ was not required to call a medical expert to testify because he did not find that Plaintiff was disabled.  [Entry #21 at 13].

Social Security Ruling 83-20 provides the following:

> In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working.  How long the disease may be determined to have existed at a disabling level of severity depends on an

informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. At the hearing, the Administrative Law Judge (ALJ) should call on the services of a medical advisor when onset must be inferred.

The ALJ is required to "consult a medical advisor after the claimant has proved that his condition is disabling, but when the date of its onset remains ambiguous." *Bird v. Commissioner*, 699 F.3d 337, 344 (4th Cir. 2012); see *Bailey v. Chater*, 68 F.3d 75 (4th Cir. 1995).

Plaintiff argues that the Fourth Circuit's decision in *Bird* sets forth a requirement that ALJ's first consider whether a claimant was disabled at any point and then call on a medical expert to determine the onset date of disability. [Entry #19 at 16]. The undersigned finds Plaintiff's interpretation to be an overbroad reading of *Bird*. Before addressing the issue of the plaintiff's onset date in *Bird*, the court found that the ALJ had failed to give retrospective consideration to medical evidence created after the plaintiff's DLI that might have been reflective of a possible earlier and progressive degeneration of the plaintiff's impairment. *Bird*, 699 F.3d 337, 345. The court provided the following instruction:

> [O]n remand, the ALJ initially will be required to review all the evidence in the record to determine whether Bird was disabled at any time. If the ALJ determines that Bird has established a disability resulting from his PTSD, but that the medical evidence of the date of onset of that disability is ambiguous such that a retrospective inference to the period before Bird's DLI would be necessary, the ALJ will be required to obtain the assistance of a medical advisor in order to render an informed determination regarding the date of onset.

*Id.* Therefore, the Fourth Circuit does not require that a medical expert be called to testify any time that a Social Security claimant establishes disability at any point, but

only where the date of onset of disability is ambiguous. Furthermore, *Bird* does not require that the ALJ articulate whether the claimant became disabled at any point. It only requires that the ALJ review all the evidence to determine whether the claimant was disabled at any time.

The undersigned recommends a finding that the ALJ adequately considered the entire record and determined that it was not necessary to call a medical expert to testify. This case is distinguishable from *Bird* in that this ALJ gave retrospective consideration to medical evidence created after Plaintiff's DLI. After doing so, the ALJ concluded that the evidence did not support a finding that Plaintiff was disabled before her DLI. The ALJ's determination that Plaintiff was not disabled before that date was supported by substantial evidence and the evidence created after Plaintiff's DLI neither created such ambiguity that an onset date of disability would need to be inferred by a medical expert, nor created a presumption that Plaintiff was disabled at any time after the DLI.

### 4. Lay Observations

Plaintiff argues that the ALJ erred in failing to specify the weight or consideration he gave to the third party function report completed by Plaintiff's husband. [Entry #19 at 17].

The Commissioner argues that the ALJ was not required to explicitly weigh Plaintiff's husband's testimony. [Entry #21 at 14]. The Commissioner argues that the ALJ discussed Plaintiff's husband's testimony and concluded that the subjective statements were not entirely credible. *Id.*

20 C.F.R. § 404.1545(a)(2) indicates that the ALJ should consider "descriptions and observations" of a claimant's limitations from his or her impairments that are provided by the claimant as well as the claimant's "family, neighbors, friends, or other persons."

On August 31, 2010, Plaintiff's husband, Richard Lee Russell, Jr., completed a third party function report.  Tr. at 174–81.  Mr. Russell indicated that Plaintiff's daily activities included feeding pets, taking medications, watching television, cleaning, and picking up their grandchildren from school.  Tr. at 174.  Mr. Russell indicated that Plaintiff was "in pain . . . gets up during the night," and "takes naps during the day to get by."  Tr. at 175.  He indicated that Plaintiff did the laundry on a weekly basis and washed dishes using a dishwasher, but that chores took her twice as long as in the past.  Tr. at 176.  He indicated that Plaintiff did not travel outside the home often because of pain.  Tr. at 179.  He indicated that Plaintiff's impairments affected her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, and use her hands.  *Id.*  Mr. Russell indicated that Plaintiff could lift about three pounds and walk about 30 yards.  *Id.*

The ALJ acknowledged the function report completed by Mr. Russell and the indications therein.  Tr. at 16.  While he did not specifically indicate the weight accorded to Mr. Russell's report, he indicated the following with respect to Plaintiff's alleged symptoms "the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms

are not credible to the extent they are inconsistent with the above residual functional capacity assessment." Tr. at 17.

The undersigned recommends a finding that the ALJ considered the statement of Richard Lee Russell, Jr.   20 C.F.R. § 404.1545(a)(2) requires that descriptions and observations of a claimant's family member be considered, but it does not indicate that the ALJ has to specify how the information is weighed or considered.  The ALJ explicitly stated in the decision that Mr. Russell's report was considered and he recounted some of the details in the statement.  The regulations require no more than that the ALJ consider the descriptions and observations, which he did.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law.  Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

September 5, 2014                                Shiva V. Hodges
Columbia, South Carolina                 United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).